J-A27019-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| THEODORE FITZPATRICK AND LINDSAY FITZPATRICK | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : | |
| v. | : | |
| ELLIOTT COMPANY | : | |
| Appellee | | No. 432 WDA 2017 |

Appeal from the Judgment Entered March 14, 2017
In the Court of Common Pleas of Allegheny County Civil Division at No(s):
G.D. No. 15-9202

BEFORE:  BENDER, P.J.E., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY SHOGAN, J.:              **FILED JANUARY 30, 2018**

Appellants, Theodore and Lindsay Fitzpatrick, appeal from the judgment entered on March 14, 2017,[1] in favor of the Elliott Company ("Elliott").  We affirm.

The trial court summarized the factual and procedural history of this case as follows:

I.     **BACK[G]ROUND**

---

[1] Appellants' notice of appeal incorrectly states that they are appealing from the February 27, 2017 order denying their motion for post-trial relief.  An appeal properly lies from entry of judgment, not from the denial of a post-trial motion.  **Kaufman v. Campos**, 827 A.2d 1209, 1210 n.1 (Pa. Super. 2003).  The caption has been corrected accordingly.

Theodore Fitzpatrick [("Fitzpatrick")] is a Carnegie Mellon University educated engineer. [Elliott] is an international company that designs, manufact[ures], installs and services turbo-machinery for prime movers, gas compressors and rotating machinery. In or about March of 2012, [Fitzpatrick] was approached about an expatriate position with [Elliott] in Singapore. It was indicated that this was a promotion and that [Fitzpatrick] would serve in the position of Regional Sales Manager for Asia-Pacific.

At that same time, [Fitzpatrick] alleges that [Elliott] further offered employment assistance to his spouse, Lindsay (hereinafter, "Plaintiff wife") by way of [Elliott's] International Assignment Policy, which offered employees' spouses $4,000 towards continuing education, career counseling, job search assistance, etc.

On December 21, 2012, [Fitzpatrick] officially accepted [Elliott's] Expatriate Position Offer after negotiating the length of his stay abroad from three to four years. Due to issues regarding legal documents, [Appellants'] relocation to Singapore was delayed. The couple sold their house in Jeannette, Pennsylvania and was reimbursed for all closing costs by Elliott. The couple stored some of their assets in Jeannette and moved the balance of their belongings to storage in Florida. The couple resided with [Plaintiff] wife's family [in Florida], but they claimed this to be their new residence.

On March 25, 2013, [Appellants] moved to Singapore. On January 28, 2015, via a conference call with the Vice President of Human Relations, [Fitzpatrick] was terminated. This was twenty-six (26) months prior to the four (4) years [Fitzpatrick] believed he was contracted to work for [Elliott] under their then existing understanding. [Fitzpatrick] received a letter, dated January 28, 2015, confirming [Elliott's] termination of his employment.

[Appellants] contend that the parties entered into an employment contract for a definitive time period of four (4) years. [Elliott] disputes this assertion and asserts that [Fitzpatrick] was hired as an 'at will' employee and that what he deems as an employment contract is merely his terms of employment in Singapore and a list of benefits.

- 2 -

In addition to [Fitzpatrick's] unpaid compensation, [Appellants] claim damages associated with lost wages (wife), prior unpaid bonuses, alternative living expenses, increased health insurance costs, shipping fees, childcare costs, lost fringe benefits as well as tax ramifications. [Elliott] filed a counterclaim, requesting reimbursement for a tax benefit received by [Fitzpatrick] which [Elliott] asserts was rightfully theirs to claim.

## II. PROCEDURAL HISTORY

This matter was initiated by the filing of a complaint by [Appellants] on May 22, 2015. [Fitzpatrick] alleged that he was wrongfully terminated from a four (4) year employment agreement without cause. Preliminary objections were filed by [Elliott] on July 14, 2015, among them, a challenge as to venue. An Answer as to the Preliminary Objections was filed by [Appellants] on August 6, 2015. On August 11, 2015, an Order was issued scheduling a telephone conference as to these matters before the Honorable Ronald Folino. Following said conference, on September 4, 2015, an Order issued setting a briefing schedule and brief limits (Order, Folino, J.).

Following the filing of said briefs, an Answer, New Matter and Counterclaim, were filed by [Elliott] on April 14, 2016. [Appellants'] Reply to New Matter was filed on April 22, 2016. On May 12, 2016, [Elliott] filed [its] Reply to New Matter and Counterclaim. Following Motions to Compel and further discovery delays, the case was removed from the November, 2016, trial list.

In September of 2016, [Elliott] filed an Emergency Motion for Leave to file for Summary Judgment. On October 16, 2016, Judge Ronald Folino denied [Elliott's] request for leave to file for Summary Judgment. On November 16, 2016, this matter was transferred to this writer for trial and disposition of all related matters (Order, 11/14/16, Folino, J.).

On November 29, 2016, a jury was empaneled to render a verdict and resolve this matter. Following five days of trial, on December 5, 2016, the jury returned a verdict in favor of [Elliott] [finding that Fitzpatrick and Elliott had entered into a 4-year employment agreement ("Employment Agreement") but concluding that Elliott had just cause to terminate the

Employment Agreement and, thus, awarding Appellants no damages] and against [Appellants] on [Elliott's] counter claim in the amount of $14,964.00. On December 13, 2016, [Appellants] filed Post-Trial Motions. In response thereto, this writer issued an Order dated January 3, 2017, scheduling argument on [Appellants'] Motion for Post-Trial Relief for February 22, 2017.

Following said argument, this writer denied [Appellants'] motion by Order of February 27, 2017. On March 14, 2017, [Appellants] filed a Notice of Appeal to the Superior Court of Pennsylvania. On that same date Judgment on the Verdict was entered in the amount of $14,964.00. On March 20, 2017, this Court directed [Appellants] to file a Concise Statement of Matters Complained of on Appeal pursuant to P[a].R.A.P. § [sic] 1925(b). Said statement was timely filed on April 10, 2017, placing this matter properly before the Superior Court of Pennsylvania.

Trial Court Opinion, 5/15/17, at 1-4.

Appellants present the following issues for our review:

I.  Whether the trial court committed an error of law when it denied Appellants' Motion for [judgment nothwithstanding the verdict ("JNOV")] with respect to liability because:

    A.  Elliott failed to prove that the Employment Agreement imposed any duty upon Fitzpatrick to maintain a Pennsylvania domicile; and Elliott failed to prove that Fitzpatrick otherwise materially breached the Employment Agreement.

    B.  Fitzpatrick could not be terminated for refusing to sign false tax returns.

[II.] Whether the trial court committed legal error when it denied Appellants' motion for JNOV on Elliott's counterclaims because:

    A.  Elliott's unjust enrichment claim was not cognizable after the jury concluded that [the] parties had a written agreement and Elliott never proved [Appellants] were unjustly enriched.

- 4 -

      B.    Elliott's conversion counterclaim was barred by the gist of the action doctrine and because the failure to pay a debt does not constitute conversion as a matter of law.

[III.] Whether the denial of Appellants' Motion for a New Trial was legal error because the trial court:

      A.    Permitted the jury to hear irrelevant, prejudicial evidence and argument related to Fitzpatrick's deletion of information from his company computer after he was terminated.

      B.    Permitted the jury to hear irrelevant, prejudicial evidence and argument related to Fitzpatrick's one-off $200,000 fantasy football winning.

      C.    Instructed the jury that Elliott merely had to prove "just cause" to terminate the Employment Agreement, and allowed that incorrect standard on to the verdict slip, when the burden on Elliott was to establish a material breach of the Employment Agreement.

IV.    Whether on remand Appellants should again be forced to rebut the at–will employment presumption when the jury concluded that the parties entered into a 4-year Employment Agreement.

Appellant's Brief at 5.[2]

Appellants' first two issues, including subparts, challenge the trial court's failure to grant motions for JNOV. Our standard of review of a trial court's order declining to grant JNOV is as follows:

When considering a challenge to denial of JNOV,

_____

[2] For ease of disposition, we have renumbered Appellants' issues.

the standard of review for an order granting or denying judgment notwithstanding the verdict is whether there was sufficient competent evidence to sustain the verdict. We must view the evidence in the light most favorable to the verdict winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences. Furthermore, judgment nov should be entered only in a clear case, where the evidence is such that no reasonable minds could disagree that the moving party is entitled to relief. Review of the denial of judgment nov has two parts, one factual and one legal:

> Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded evidence at trial, we will not substitute our judgment for that of the finder of fact.

*Underwood ex rel. Underwood v. Wind*, 954 A.2d 1199, 1206 (Pa. Super. 2008).

In their first claim and related subparts, Appellants argue that the trial court erred when it denied Appellants' motion for JNOV on liability because Elliott failed to establish a legal justification for terminating the Employment Agreement. Appellants' Brief at 18. Appellants contend that Elliott failed to establish that the Employment Agreement imposed a duty for Fitzpatrick to remain "a domicile of Pennsylvania." *Id.* at 18-21. Instead, Appellants assert the purported violation with respect to taxes was a violation of Elliott's Code of Conduct, as opposed to the Employment Agreement itself. *Id.* at 21. Appellants contend that the Code of Conduct was not made part of the Employment Agreement, and neither the Employment Agreement nor the International Assignment Policy make any reference to the Code of Conduct. *Id.* Furthermore, Appellants assert that the Employment

Agreement contains an integration clause which states "the document constitutes 'the complete understanding of the terms and conditions of your assignment.'" *Id.* Moreover, Appellants maintain that even if the Employment Agreement imposed a duty regarding Fitzpatrick's domicile, Elliott failed to prove the alleged breach was material, and therefore, Elliott was not relieved of its duty to perform pursuant to the Agreement. *Id.* at 24-27.

Relevant to Appellants' claim is Elliott's tax equalization policy. This policy was included in the December 5, 2012 letter from Elliott to Fitzpatrick, which the jury found to be the basis of an employment agreement. The letter outlined the terms of the Singapore assignment[3] and stated the following with regard to the tax equalization policy:

> **Tax Equalization Policy:** During your assignment, in order to equalize your income tax bill with that of your domestic counterparts at the same salary, a hypothetical U.S. income tax will be deducted from your base salary. This hypothetical tax will be based on your base salary only.
>
> A public accounting firm is retained by Elliott and will assist in the preparation and filing of your home and host income taxes and will provide Elliott with a statement of the tax liability on the company-earned income which will then be paid by the company.

_____

[3] The letter specifies that the assignment in Singapore would be for three years. Subsequently, the parties agreed to extend the assignment to four years, which agreement was reflected in the email from Amanda Polinsky to Fitzpatrick on January 8, 2013. Complaint, Exhibit D, 1/8/13 Email, at 1.

Complaint, Exhibit C, Employment Agreement, at 1-2. The Employment Agreement also incorporated the terms of the International Assignment Policy. *Id.* at 2.

The International Assignment Policy included the following language regarding the tax equalization policy:

Tax Equalization

It is the objective of the Elliott International Assignment policy to keep each assignee on par with their home country counterparts. An assignment in practicality is a temporary work arrangement and could have the potential to result in windfalls and/or shortfalls from a financial perspective, depending on the country combination of the assignment. The intent of tax equalization is to neither advantage or disadvantage the employer nor employee when tax costs occur. Each year, after the home and foreign tax returns have been prepared, Ernst & Young will calculate an actual tax amount. To the extent that the actual tax is less than the hypothetical withholding deducted from applicable income, the company will reimburse you. To the extent that the actual tax is greater than the hypothetical tax withholding, you may be liable for the difference. All equalization payments will be computed in the currency of the country from which you receive your salary.

Generally in the year following repatriation, a final settlement will be made. There may be cases where there are carryover credits that reduce your taxes from prior years. The amount of the reduction must be repaid to the company.

Both you as the employee and Elliott have responsibility in the tax preparation exercise. The company will pay the full cost of preparing the home and foreign income returns, while you as the employee must provide and maintain adequate records to ensure that the data can be made available in a timely fashion to fulfill the year-end equalization process. Ernst & Young will set up an orientation meeting to explain the process surrounding our assignment and country combination as close to the beginning of your assignment as time will allow.

> There may be certain circumstances where there is no tax obligation in the host country. In such circumstances and at the sole discretion of the organization, a "Local Plus" compensation arrangement will apply. In a "local plus" circumstance, to fulfill the objective of "neither advantaging nor disadvantaging" the employer nor employee some of the assignment based premium allowances will be suspended or eliminated from the assignment package to offset the tax free condition that the assignee may temporarily enjoy for the duration of their stay. This arrangement keeps each assignee on par with their home country peers to which they will ultimately return to once the assignment is completed.

International Assignment Policy, Appellants' Exhibit 22, at 16-17.

> "Hypothetical Tax Withholding" is defined as follows:
>
> A hypothetical tax withholding is an approximation of the home country income tax that would have been levied against you had you been performing the same job in the home country. Providing a personal income estimate may alleviate the need for a large payment to the company when the equalization settlement is prepared. The goal is that that after the hypothetical withholding your net pay will be comparable to any other employee with the same salary paying taxes. Hypothetical taxes do not include any assignment based allowances. Since Elliott reduces your income by the hypothetical tax withholding, Elliott pays on your behalf all home and foreign taxes actually assessed.

*Id.* at 16.

Of further relevance to this matter is the following provision included in the International Assignment Policy as related to the preparation of tax returns:

> Tax Preparation
>
> In virtually all countries, tax authorities require timely payment of taxes through the filing of a return. Elliott partners with a public accounting firm to assist with this requirement. Ernst & Young will facilitate the preparation and filing of the required

home and foreign tax returns. It is the expatriate's responsibility to respond to the requests for the information from the provider in a timely fashion to prevent late fees and penalties. Late fees caused by an employee's non-responsiveness, will become the obligation of the employee. Elliot will pay for the services provided for personal income taxes only.

*Id.* at 15-16.

In addressing Appellants' first claim, the trial court provided the following analysis:

> This writer is confounded by the difference in perspective exhibited by this claim of error. [Appellants] now assert to the Superior Court that their testimony and evidence was so compelling that reasonable minds could not disagree as to the [Appellants'] breach of contract claim. To assert that this ruling, following days of testimony which this writer presided over, and now privy to a detailed transcript of same, following a jury award to the contrary and in favor of [Elliott], was "so contrary to the evidence as to shock one's sense of justice" is completely baseless and contrary to an objective assessment of this trial and evidence adduced during trial (See Samuel-Bassett v. Kia Motors Am., 34 A.3d 1, 29 (Pa. 2011)[)].
>
> [Appellants'] argument discounts all unfavorable testimony regarding [Fitzpatrick], absolving him of all allegations of breach in regards to his own conduct, and fixates only on arguments favorable to his position. This was not the standard he needed to prove at trial, at the time of his Motion for JNOV and surely not now on appellate review when faced with the aforementioned standard.
>
> For instance, a focal point of this litigation concerned the tax issue and [Fitzpatrick's] 'state of employment.' On cross-examination, [Fitzpatrick] was questioned as to this major issue, "[f]or tax purposes you will be equalized back to PA, the state of your employment" (Tr. at 167). [Fitzpatrick] received this information by email dated January 4, 2013, prior to his assignment (Id.). A follow up email by the same Human Resources facilitator reiterated on July 11, 2014, said "[w]e have been over the assignment tax philosophy a number of times with

you. You are equalized to the headquarters address and will continue to have PA taxes withheld" (Tr. At 170).

[Fitzpatrick] was essentially testifying that although it was explained to him that his employer's domicile, prior to his assignment, would be deemed to be [Fitzpatrick's] domicile for the purpose of filing state income taxes when the issue was raised, he refused to act in accordance with the prearranged understanding, refusing to sign the Pennsylvania income tax document(s) prepared by Ernst and Young and risking his termination. He now wants this writer to find a breach of contract on behalf of the employer despite a finding of the contrary by the jury empaneled (See Tr at 160-171). When asked to provide authority that his employer through, Ernst and Young, provided information regarding a move to Florida or another place of domicile, [Fitzpatrick] replied, "I lost access to most of my E-mails, so there may be some but had no proof of same to display to the jury[."] (See id. at 172-73). This position is fanciful and should not be given further consideration on appellate review.

[Appellants] raise a claim of error with this Court's determination not to grant JNOV as it related to [Appellants'] claim of unjust enrichment. The unjust enrichment claim was raised by [Elliott], accusing [Fitzpatrick] from 'unjustly enriching' himself with the benefit of a tax refund. [Fitzpatrick] testified, "Elliot was going to pay the taxes on most of my living expenses overseas. They were going to pay the Singapore tax, the US tax and only charge me a hypothetical value as though I was still living in the US" (Trial Transcript, hereinafter, "Tr." at 85).

Again, the crux of [Appellants'] case has been the assertion that [Fitzpatrick] was fired for his refusal to sign a 'bogus' tax return based on the fact that the company was 'forcing' him to use a Pennsylvania address where he no longer resides. [Fitzpatrick] maintained that he had been a resident of Florida prior to his move and employment in Singapore and that he should not be filing a Pennsylvania return and that it was improper for Elliot, through its accountant, Ernst and Young, to force him to sign an inaccurate return (See, Tr. at 108).

But on cross-examination, [Fitzpatrick] was questioned as to his previous testimony at a deposition conducted on January 12, 2016, in which he was questioned, "[s]o the first time you

- 11 -

physically lived there (Naples, Florida) was February, 2015?", to which [Fitzpatrick] replied, "me personally, yes." (Tr. at 148). [Fitzpatrick] was next confronted with a form he submitted to the Elliott Company from March of 2013 in which [Fitzpatrick] represents that he lives at 2148 Par Drive, Naples, Florida (Id. at p. 149). [Fitzpatrick] went on to testify under cross-examination that he in fact still owned his home in Jeanette, Pennsylvania in March of 2013, and did not own or lease property in Florida at said time (See id. at 150-51).

[Fitzpatrick] was next questioned as to whether he remembered being "explicitly advised in writing that regardless of what address you used during your assignment, your taxes would be prepared as if you continued to live and work in Jeanette?" (Id. at 164). To which, [Fitzpatrick] answered, "I don't remember the exact wording" (Id.). Again, [Fitzpatrick] was confronted with email correspondence between himself and Jean Bayuk on January 4, 2013, in which she states, "[f]or tax purposes you will be equalized back to PA, the state of your employment." (Id. at 167). This writer does not find himself on a limb when he presumes that the jury found [Fitzpatrick] unconvincing, if not incredible when it came to various issues during this trial.[1]

> [1] It must be noted that the [c]ourt advised all counsel that the jury must be informed that Florida does not have an income tax and Pennsylvania does. [Appellants'] counsel refused to offer this fact as part of [Appellants'] case.

It was and remains clear to this writer that [Appellants'] shortcomings came in their failure to meet their burden of proof, and in convincing the jury of anything that would entitle them to relief. Their issues were not created by inconsistent findings by this judge or the jury empaneled but rather a lack of their own credibility. A reading of [Fitzpatrick's] trial testimony under cross-examination as to all disputed issues should remind [Appellants] as to why they were unsuccessful in proving the claims that entitled them to relief.

Trial Court Opinion, 5/15/17, at 7-10.

The trial court's conclusions are supported by the evidence of record. Fitzpatrick's testimony reveals that Elliott, on many occasions, had explained the tax equalization process to Fitzpatrick, both prior to his acceptance of the assignment and during his assignment in Singapore. N.T., 11/30/17, at 85, 164-212. Fitzpatrick indicated an understanding of the tax equalization as follows: "Basically, Elliott was going to pay the taxes on most of my living expenses overseas. They were going to pay the Singapore tax, the US tax and only charge me a hypothetical value as though I was still living in the US." *Id.* at 85.

An email sent September 25, 2014, from Michele Connellan at Ernst & Young Accountants to Fitzpatrick clearly summarized the equalization policy. *Id.* at 182. The following exchange regarding this email and policy occurred at trial:

> [Elliott's Counsel]: So this is an E-mail sent to you on September 25, 2014, from Michele Connellan at Ernst & Young. And it's "Summary of Tax Filing Positions and Tax Equalization Policy." Did you receive this E-mail?
>
> [Fitzpatrick]: I assume so, yes.
>
> [Elliott's Counsel]: You don't recall whether or not you did?
>
> [Fitzpatrick]: I mean, it's to me. I would assume I did.
>
> [Elliott's Counsel]: But you don't recall by looking at it whether or not you, in fact, received it or read it?
>
> [Fitzpatrick]: It looks familiar. There were a lot of discussions.
>
> [Elliott's Counsel]: This is the crux of your case; right?

[Fitzpatrick]: Yes.

[Elliott's Counsel]: You don't recall whether you saw this E-mail?

[Fitzpatrick]: Specifically, no. I would have to read it.

[Elliott's Counsel]: . . . . So I'm going to start at the third sentence of this paragraph where Ernst & Young explains to you. "The guiding principle behind tax equalization is that an individual will, wherever possible, be no better or worse off from a tax perspective due to their assignment." Did you understand that concept?

[Fitzpatrick]: Yes.

[Elliott's Counsel]: And then continues "Under this policy, Elliott assumes responsibility for the actual taxes due globally during the period of assignment; and you, as an individual, are held to a stay-at-home tax."

Did you understand this?

[Fitzpatrick]: Okay.

[Elliottt's Counsel]: Did you understand that?

[Fitzpatrick]: Yes.

[Elliott's Counsel]: So you understood that pursuant to your agreement Elliott was going to pay all your taxes, and you were required to file your taxes as if you were living and working at your home prior to leaving for assignment?

[Fitzpatrick]: It says I'll be equalized to the United States.

[Elliott's Counsel]: And so you just thought you ignored state and local taxes?

[Fitzpatrick]: I assumed they would be filed with my correct residence.

[Elliott's Counsel]: Residence means somewhere you never lived?

[Fitzpatrick]: Residence being my tax residence.

[Elliott's Counsel]: What is a tax residence?

[Fitzpatrick]: Where I owed taxes.

[Elliott's Counsel]: So whatever address you put on the form?

[Fitzpatrick]: I'm not sure.

[Elliott's Counsel]: I'm just trying to understand what you meant.

[Fitzpatrick]: I can't pay taxes to a house I've already sold.

[Elliott's Counsel]: And so what is a tax residence in your mind?

[Fitzpatrick]: I had to have a US residence, and that was in Florida.

[Elliott's Counsel]: So the next sentence goes on. "This stay-at-home tax or hypothetical tax is based on where you were living/working prior to acceptance of the assignment." Did you understand that?

[Fitzpatrick]: That's what she says.

[Elliott's Counsel]: Did you understand that?

[Fitzpatrick]: I mean, I know what she's saying.

[Elliott's Counsel]: You what? I'm sorry?

[Fitzpatrick]: I understand what she's saying.

[Elliott's Counsel]: And so you understood this concept as of September 25, 2014; correct?

[Fitzpatrick]: I understand what this E-mail says, yes.

[Elliott's Counsel]: So where were you living and working prior to accepting your assignment?

[Fitzpatrick]: Prior to accepting, I guess I was still in Jeannette.

- 15 -

[Elliott's Counsel]: So pursuant to Ernst & Young's interpretation of the policy and the tax law position, as it says here in the subject line, you were required to file your taxes in Pennsylvania as if you were in Jeannette?

\* \* \*

[Elliott's Counsel]: Did you understand that you were -- that this was Ernst & Young's interpretation of the policy?

[Fitzpatrick]: In this E-mail, yes. Like I said prior, my interpretation and my assumption was Ernst & Young would be filing as a Florida resident.

[Elliott's Counsel]: And your termination occurred after this E-mail; correct?

[Fitzpatrick]: Yes.

[Elliott's Counsel]: And so the second to last sentence -- I'm sorry, third to last sentence of this first paragraph. "As your assignment departure was PA, under the Elliott policy, you will be held to a federal, PA state, PA local and US social stay-at-home tax. Therefore, regardless of the tax residency position taken on the actual PA state and local returns, you will still be responsible for paying a PA state and local tax as if you had not departed." Do you understand that?

[Fitzpatrick]: Right. We departed from Florida.

[Elliott's Counsel]: It doesn't say where you departed. It says as if you had not departed.

N.T., 11/30/16, at 181-185.

Furthermore, Brian Lapp, Vice President of Human Resources at Elliott, testified that the tax equalization policy was not based on residency, but instead was based on the employee's location prior to leaving for the assignment. N.T., 12/1/16, at 302-305. Michelle Connellan, Senior

- 16 -

Manager for Ernst & Young, also testified that an employee's residency had no impact on where taxes had to be filed. N.T., 12/2/16, at 11-15.

Accordingly, the record supports the conclusion that Fitzpatrick had been advised of the tax equalization policy prior to his acceptance of the Singapore assignment and during his assignment, and was given further explanation of the policy prior to his termination. The tax equalization policy was referenced in Fitzpatrick's Employment Agreement and the International Assignment Policy. Although Fitzpatrick is correct in his statement that his Employment Agreement and the International Assignment Policy do not specifically require that he maintain domicile in Pennsylvania, there was no requirement that he do so, and his termination was not based on his failure to maintain domicile in Pennsylvania. Instead, the tax equalization policy required that Appellant was to be taxed at the place of his work and residence **prior** to leaving for his international assignment. That location was Jeanette, Pennsylvania. The fact that Appellant had a stop in Florida with his wife prior to leaving for his assignment is irrelevant. Again, his place of work prior to accepting the Singapore assignment was in Jeanette, Pennsylvania. That Appellants intended to reside, and have in fact been residing, in Florida with Plaintiff Wife's parents since Fitzpatrick's termination also is irrelevant to the tax equalization policy. Fitzpatrick acknowledged that he failed to complete the tax return in compliance with Elliott policy. N.T., 11/30/16, at 178. Moreover, Fitzpatrick stated that he never paid the

- 17 -

$14,964 calculated by Ernst & Young as owed to Elliott pursuant to the tax equalization policy. *Id.* at 176-178.

Viewing the evidence presented in the light most favorable to Elliott, and giving it the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences, we are constrained to agree with the trial court that JNOV in Appellants' favor was not warranted. Elliott was not required to establish that Fitzpatrick was to maintain a Pennsylvania domicile. Furthermore, the evidence established that Fitzpatrick was terminated for cause, specifically for failure to file his taxes and comply with Elliott's tax equalization policy. Consequently, the trial court did not err in denying Appellants' motion for JNOV with respect to liability. Thus, Appellants are entitled to no relief on their first claim and related sub-issues.

In their next issue and related sub-parts, Appellants argue that the trial court erred in denying their motion for JNOV on Elliott's counterclaims. Appellants' Brief at 46. Appellants maintain that Elliott's unjust enrichment claim fails as a matter of law because the jury found an express agreement between the parties. *Id.* Appellants argue that Elliott is seeking to collect a tax refund on a tax return that never was filed. *Id.* at 47. Appellants further argue that Elliott's conversion claim fails under the gist of the action doctrine and that failure to pay a debt does not constitute conversion. *Id.* at 47.

"Unjust enrichment is an equitable doctrine, and when unjust enrichment is present, the law implies the existence of a contract requiring the defendant to pay to the plaintiff the reasonable value of the benefit conferred." ***Temple University Hosp., Inc. v. Healthcare Management Alternatives, Inc.***, 832 A.2d 501, 508 (Pa. Super. 2003).

> A claim for unjust enrichment arises from a quasi-contract. A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another.
>
> The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. Whether the doctrine applies depends on the unique factual circumstances of each case. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.
>
> Moreover, the most significant element of the doctrine is whether the enrichment of the defendant is unjust. The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff.

***Stoeckinger v. Presidential Financial Corp. of Delaware Valley***, 948 A.2d 828, 833 (Pa. Super. 2008) (internal citations and quotation marks omitted). "Where an express contract already exists to define the parameters of the parties' respective duties, the parties may avail themselves of contract remedies and an equitable remedy for unjust enrichment cannot be deemed to exist." ***Villoresi v. Femminella***, 856 A.2d 78, 84 (Pa. Super. 2004).

Conversion is a tort by which the defendant deprives the plaintiff of his right to a chattel or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and without lawful justification. *Chrysler Credit Corporation v. Smith*, 643 A.2d 1098, 1100 (Pa. Super. 1994). "A plaintiff has a cause of action in conversion if he or she had actual or constructive possession of a chattel at the time of the alleged conversion." *Id.* Money may be the subject of conversion. *Francis J. Bernhardt, III, P.C. v. Needleman*, 705 A .2d 875, 878 (Pa. Super. 1997)

> Pursuant to Pennsylvania case law, a conversion is widely understood as deprivation of another's right of property in, or use or possession of, chattel, or other interference therewith, without the owner's consent and without lawful justification. A person may incur liability for conversion by unreasonably withholding possession from one who has the right to it.

*PTSI, Inc. v. Haley*, 71 A.3d 304, 314 (Pa. Super. 2013) (emphasis omitted). "The gist-of-the-action doctrine bars a tort action 'when the gist or gravamen of the cause of action stated in the complaint, although sounding in tort, is, in actuality, a claim against the party for breach of its contractual obligations.'" *Weinar v. Lex*, ___ A.3d ___, 2017 Pa. Super. 398 at 16 (Pa. Super. 2017). "But we have cautioned against prematurely dismissing a tort action on the basis of this doctrine, because our rules permit the pleading of tort and contract claims in the alternative." *Id.*

At trial, Fitzpatrick testified that by the time of trial, he had in fact filed his 2013 tax return and used a personal accountant to do so. N.T., 11/30/16, at 178. Thus, contrary to his assertions, the 2013 tax return was

eventually filed, and Fitzpatrick received the benefit of any tax refund. Moreover, Fitzpatrick acknowledged that he had paid nothing to Elliott based on the 2013 tax return and Elliott's tax equalization policy. *Id.* at 176-178. Accordingly, the elements of conversion and unjust enrichment have been established.

Furthermore, it was a question for the jury as to whether the documents presented at trial created an employment contract between the parties. The jury made a factual finding that the documents indeed created a contract. However, when Fitzpatrick finally filed his 2013 tax return and received the tax refund, he was no longer employed by Elliott. Thus, the employment agreement between the parties did not serve as a contractual basis that precluded recovery under a conversion or unjust enrichment theory. Thus, the trial court did not err in denying Appellants' motion for JNOV on Elliott's counterclaims.

In their third claim, Appellants argue that the trial court erred in denying their motion for a new trial. Appellants' Brief at 4. In the first two sub-claims under this issue, Appellants argue that the trial court abused its discretion in admitting irrelevant and prejudicial evidence at trial, thus warranting a new trial. Appellants' Brief at 32. Under this claim, Appellants first assert that the trial court improperly admitted evidence that Fitzpatrick, after he was terminated, removed data from his Elliott-issued computer. *Id.* at 33. Appellants point to the trial court's explanation for admission of the

evidence as the basis for the error in admitting the evidence, which explanation was as follows: Elliott "argued convincingly that the destruction of the company's contents would have been a violation of a company policy that would have resulted in dismissal." *Id.* Appellants maintain that it was undisputed that at the time of the destruction, Fitzpatrick already was terminated. *Id.* Thus, Appellants posit, what would have happened to Fitzpatrick had he committed that act while employed was irrelevant. *Id.* Appellants contend that this irrelevant evidence was prejudicial and may have affected the verdict. *Id.*

Our standard of review in the consideration of a trial court's denial of a motion for a new trial is as follows:

> When assessing the trial court's denial of a motion for new trial, we apply a deferential standard of review. The decision whether to grant or deny a new trial is one that lies within the discretion of the trial court. We will not overturn such a decision unless the trial court grossly abused its discretion or committed an error of law that controlled the outcome of the case. Upon review, the test is not whether this Court would have reached the same result on the evidence presented, but, rather, after due consideration of the evidence found credible by the trial court, and viewing the evidence in the light most favorable to the verdict winner, whether the court could reasonably have reached its conclusion.

*B & L Asphalt Industries, Inc. v. Fusco*, 753 A.2d 264, 267 (Pa. Super. 2000) (internal citations and quotation marks omitted).

Our standard of review regarding admission of evidence at trial is well-established:

The admission or exclusion of evidence is within the sound discretion of the trial court, and in reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law. Thus our standard of review is very narrow.... To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*McManamon v. Washko*, 906 A.2d 1259 (Pa. Super. 2006) (internal citations and quotation marks omitted). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record, discretion is abused." *Cigna Corp. v. Executive Risk Indem., Inc.*,

111 A.3d 204, 211 (Pa. Super. 2015).

The record reflects that Appellants presented a motion *in limine* seeking to exclude any evidence regarding trade secrets as related to the information that Fitzpatrick "wiped" from the Elliott-issued laptop after his termination. N.T., 11/30/16, at 6-9. It was explained to the trial court that a separate case regarding the trade secrets had been filed by Elliott against Fitzpatrick and was pending at the time of the trial in this matter. *Id.* In ruling on the motion, the trial court stated the following:

> [Trial Court]: The trade secret – Elliott is precluded from making any reference to the trade secret lawsuit pending in this county. Then Exhibits 42 to 47, what are they?

> [Appellants' Counsel]:  Those are the motion[s] for preliminary injunction that is in the other case.  All of those exhibits are related to the other case.
>
> [Trial Court]:  If they can find -- I'll want to see it preliminarily here in sidebar.  If there is some statement, some great contradiction that would eliminate liability under your lawsuit, well, then, I'll look at it.  That's the problem with a lot of this stuff.  We have to see how it comes in.  So I'm signing this and precluding any reference, [Elliott's Counsel], to the trade secrets.  Because if you get into it, then [Appellants' counsel] has the right to say, "Hey, I didn't want to do that.  And I don't want to try a trade secrets case here."

*Id.* at 10.

During cross-examination of Fitzpatrick, Elliott's counsel began questioning Fitzpatrick regarding his return of the Elliott-issued laptop.  N.T., 12/1/16, at 260.  The parties engaged in a sidebar before Fitzpatrick answered.  *Id.*  Appellants' counsel objected to questioning regarding the computer based on the trial court's ruling on the motion *in limine* that precluded evidence related to the trade secret lawsuit.  *Id.* at 260.  Elliott's counsel argued that the questions were unrelated to the computer, but instead pertained to the information that was on the laptop.  *Id.*  Elliott's counsel stated the following in asserting the admissibility of the evidence related to Fitzpatrick's "wiping" of the laptop data:  "Our witnesses are going to testify that had [Fitzpatrick wiped the data], as an employee he would have been terminated, which is after-acquired evidence, which will cut off any damages he would have."  *Id.* at 261.  This exchange followed:

> [Elliott's Counsel]:  It has nothing to do with the decision to fire.  This is an affirmative action −

- 24 -

[Trial Court]: You're saying even if he signs the tax return, they could have fired him, anyways?

[Elliott's Counsel]: No -- yeah. Exactly. They're saying even if he was ever found liable, damages are cut off as soon as you learn of something that would, also have resulted in the person's termination, had their employment continued.

[Trial Court]: Here's what I'm going to do. I'm going to allow one question, and please ask him to answer directly.

* * *

And the question is: "Did you erase anything from this computer?" That's it. Thanks.

*Id.* at 263-264.

Elliott's counsel asked Fitzpatrick if he wiped data from the laptop before returning it to Elliott. N.T., 12/1/16, at 264-265. Fitzpatrick acknowledged that he did. *Id.* at 265. During subsequent cross-examination, counsel asked Fitzpatrick if it was his understanding that he could be terminated for intentionally destroying Elliott property. *Id.* at 267. Appellants' counsel objected, and the trial court sustained the objection. *Id.*

Further, during the direct examination of John Rann, vice president of the engineer products business unit at Elliott, Elliott's counsel asked the following question: "[i]f you would have advised an employee that you needed to forensically image his computer and that employee deleted all the –". N.T., 12/2/16, at 50. Appellants' counsel objected, and a sidebar between counsel and the trial court followed. *Id.* at 50. Appellants' counsel argued that the question went to the trade secret case that was separately

pending. *Id.* at 51. Elliott's counsel disagreed, stating that the question went to Elliott's affirmative defense of after-acquired evidence. *Id.* The trial court stated that it did not want to get into the trade secret case but also acknowledged that Fitzpatrick had testified that he had wiped data from the computer in order to protect his personal information. *Id.* at 52. Accordingly, the trial court ruled that Elliott's counsel was permitted to ask one question: "Is it a violation of Elliott's policy to wipe a computer clean[?]" *Id.* at 54. Elliott's counsel asked that question, to which Mr. Rann responded: "[y]es, it would." *Id.* at 55. That was the end of the questioning of Mr. Rann by Elliott's counsel. *Id.* at 55.

> In addressing this issue, the trial court explained:

> When this objection was raised at trial, [Elliott] argued convincingly that the destruction of the computer's contents would have been a violation of a company policy that would have resulted in dismissal. Further, even if said 'wiping' occurred after the employee's termination, that said evidence would be used to limit damages.

Trial Court Opinion, 5/15/17, at 13 (internal citations omitted).

The trial court's determination is supported by the evidence of record. The trial court admitted the evidence for purposes of limiting damages. Nothing in the record indicates that Elliott was attempting to introduce this evidence to establish a basis for Fitzpatrick's firing. Indeed, the trial testimony reflects that Fitzpatrick was terminated due to his insubordination with regard to failing to file the tax returns. Moreover, we cannot agree with Appellants' assertion that introduction of this evidence unfairly prejudiced

them. Thus, the trial court did not abuse its discretion in denying Appellants' motion for a new trial on the basis of admission of the limited evidence regarding Fitzpatrick's wiping of data from his computer.

Appellants next argue that the trial court erred in admitting evidence of Fitzpatrick's one-time $200,000 fantasy football winning. Appellants' Brief at 36. Appellants' maintain that Fitzpatrick's fantasy winnings were not probative to his damages, and admission of this winning was irrelevant and prejudicial. *Id.* at 37.

In addressing this claim, the trial court provided the following analysis:

> Counsel for both [Elliott] and [Appellants] acknowledged that the law, by way of its mitigation of damages jury instruction, requires a plaintiff to minimize his or her damages by taking all steps to seek substantially similar work. However, [Appellants'] counsel maintained that online gambling is vastly different from engineering work. Although this writer acknowledges that engineering is quite different from forecasting productive National Football League players on a week to week basis, this [c]ourt warned [Appellants'] counsel at that time that it depended on how the information was used, and that if a 'door was opened' by counsel's portrayal of [Appellants] as "down and out", then this writer would find said evidence "highly relevant."
>
> Counsel for [Appellants] told this court at said time that his intention was to elicit evidence that [Fitzpatrick] has remained unemployed despite the fact that "he's looked for over 500 jobs, has had 44 interviews and has been unable to get a job." [Appellants] would have preferred the jury to hear only testimony of lost wages from the date of termination until the date of trial, but the $200,000.00 in prize winnings during that same period was relevant to their claims; one cannot claim great hardship while enjoying such substantial income, no matter the source.[2] Unfortunately for [Appellants] in this instance, and as told to them at the time of this motion, "sometimes facts are disturbing, but they are what they are."

- 27 -

2  The Plaintiff Wife testified that on her return to America she obtained a job that paid substantially higher than the job she had in Singapore.

At the time of his testimony regarding his period of post-termination unemployment, while [Fitzpatrick] testified as to hundreds of resumes filed and follow-up interviews never scheduled, [Plaintiff-Wife] wept in the gallery.  The [c]ourt found the information relevant that during this same period of struggle that [Appellants] collected $200,000.00 in gambling proceeds.  The question for this writer was not whether the information was relevant but only whether the probative value outweighed any prejudicial effect.  Pa.R.E. §403, states, "the court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence (Pa.R.E. §403)."  After hearing all of the testimony up until said point, this writer found said information's relevance outweighed any prejudicial effect.

This writer found the fact that [Appellants] received $200,000.00 in fantasy football 'jackpot' proceeds during a period that [Appellants] were claiming zero income pertinent and relevant to the verdict rendered by the jury.  To suggest this information was not relevant to the jury's determination is self-serving and should not be given further consideration.

Trial Court Opinion, 5/15/17, at 14-15.

The record supports the trial court's analysis.  Furthermore, we cannot conclude that the trial court abused its discretion in admitting this evidence.  Accordingly, Appellants' claim related to the admission of evidence regarding the $200,000.00 Fantasy Football League winnings lacks merit.

In their third subclaim that the trial court erred in denying its motion for a new trial, Appellants assert that the trial court issued an improper jury charge and verdict slip.  Appellants' Brief at 41-45.  Appellants contend that

"the instruction for the jury should have simply focused upon whether Fitzpatrick's conduct amounted to a material breach of the employment agreement." *Id.* at 42. Appellants further maintain that "establishing 'materiality' requires a substantial showing." *Id.* Appellants further argue that "[t]his principle is important because []only material failure of performance by one party discharges the other party; an immaterial failure does not operate as such a discharge." *Id.* Appellants posit that:

> A new trial is warranted because Elliott's burden was lessened by only having to convince the jury that it had "just cause" to terminate the parties' contract – as opposed to the substantial one required by proving material breach. Just cause does not appear in the Employment Agreement. Nor was the jury provided any definition for that legal term of art. Left on their own to deliberate without a definition, the jury may have concluded that all Elliott needed to terminate the contract was a good reason. Or any reason.

*Id.* at 42-43 (footnote omitted).

Our standard of review in assessing a trial court's jury instructions is as follows:

> A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the [a]ppellant was prejudiced by that refusal.

*Amato v. Bell & Gossett*, 116 A.3d 607, 621 (Pa. Super. 2015).

In addressing Appellants' issue related to the jury instruction, the trial provided the following explanation:

> [Appellants'] next claim of error charges that this writer committed reversible error based upon the use of language, specifically the words, "just cause" when discussing [Fitzpatrick's] termination in both the jury instruction and special interrogatory on the verdict slip, asserting that "the jury was probably misled." The language complained of appears on page 125 of the transcript of December 5, 2016, and states:
>
> > the employee claims that Elliott wrongfully terminated his employment in violation of an employment agreement. If you find that an expressed or implied employment contract for a definite period of time existed, you must then determine if just cause existed to terminate the employee.
>
> (Tr. at 125)[.]
>
> This [c]ourt has a standing policy to limit his instructions to the Pennsylvania Suggested Standard Civil Jury Instructions only. This [c]ourt invariably rejects requests to repeat arguments or create new law. If a deviation of said instructions is allowed, it is done with the consent of the opposing party. In those circumstances, this writer will deviate from the standard instructions as long as such language is not contrary to the law or the evidence presented.
>
> With that said, in the case *sub judice*, at paragraph III of the Complaint, [Appellants] assert a "Second Cause of Action, Breach of Contract" (Complaint, p.9). The jury was asked to determine whether the parties had entered into an employment contract (See Interrogatories, #1). They were next asked whether [Fitzpatrick] was "terminated for cause" (Interrogatories, #2), i.e., whether said contract was breached. The jury empaneled answered in the affirmative.
>
> [Appellants], through counsel, were successful in convincing the jury that [Fitzpatrick] and [Elliott] entered into a valid contract as evidenced by their answer to Interrogatories at question 1, when they answered in the affirmative. [Elliott] was

- 30 -

then successful in convincing the jury that [Fitzpatrick] breached the contract, thus supplying [Elliott] with "cause" or "just cause" to terminate [Fitzpatrick's] employment.

The issue as to the "just cause" language was discussed at the charging conference, December 5, 2016, as evidenced by the transcript at pages 32-46. [Elliott] maintained the position throughout the trial that [Fitzpatrick] was not working under the terms of a contract, but rather a statement of benefits. [Elliott] further maintained that if the jury was to find that a contract existed, [Fitzpatrick] had breached the contract, with "cause" or "just cause" used synonymously with breach, and as justification for [Fitzpatrick's] termination under the contract.

Said language was deemed necessary to avoid confusing the jury due to language included in the parties' agreement. Paragraph four (4) of the parties' [initial] agreement [("Employment and Patent Agreement"), dated 5/20/02] states, "after the expiration of 12 calendar months from the date on which my employment began, my employment may be terminated by me or by the company except for **cause**, only on the expiration of two weeks' notice" (Tr. At 153, emphasis added, see also, Defendant's Exhibit A, para.4).

This [c]ourt's charge regarding the breach of contract claim begins at page 116 of the Transcript dated December 5, 2017. The charge accurately recites the Pennsylvania Suggested Standard Instructions as they relate to contract law in this Commonwealth. Any deviations made did not alt[e]r, let alone constitute an inaccurate statement of law as they relate to the principles of Pennsylvania contract law and should be considered, at most, harmless error.

Trial Court Opinion, 5/15/17, at 11-13.

After reviewing the jury instructions as a whole, we cannot agree with Appellants' assertion that the trial court abused its discretion in issuing the "just cause" instruction. The trial court instructed the jury that Fitzpatrick "is accusing [Elliott] of breach of contract. Conversely, [Elliott] is asserting that it was [Fitzpatrick] himself that breached the contract." N.T., 12/5/16,

at 116. The trial court outlined the elements of a contract, *id*. at 117-118, and defined breach of contract as follows: "A breach of contract occurs when a party to the contract fails to perform any contractual duty of immediate performance or violates an obligation, engagement or duty **and that breach is material.**" *Id.* at 118 (emphasis added). The trial court also explained: "[i]f you find that the nonperformance was immaterial and, thus, the contract was substantially performed, you must also find that a breach of the contract has not occurred." *Id.* Thus, in issuing its instruction on the breach of contract, the trial court used the same language that Appellants assert is proper. Furthermore, as explained by the trial court, the terms "cause" or "just cause" were used synonymously with breach in the instruction as justification for Fitzpatrick's termination under the contract. Indeed, Appellants' counsel acknowledged during the charging conference that in the context of this case, "cause" is synonymous with "breach." *Id.* at 36, 44. Therefore, Appellants' averment that the trial court lowered Elliott's burden of proof through its jury instructions and verdict slip by use of "cause" is without merit. This claim fails.

In their final issue, Appellants argue that if the matter was remanded for a new trial, they should not be required to re-litigate the fact that Fitzpatrick and Elliott entered into a four-year employment agreement. Appellants' Brief at 48-49. Given our disposition of Appellants' previously listed issues, we need not address this claim.

Judgment affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  1/30/2018