J-A10036-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| BBB INDUSTRIES, LLC., A DELAWARE LIMITED LIABILITY COMPANY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| | : | No. 3003 EDA 2019 |
| CARDONE INDUSTRIES, INC. A PENNSYLVANIA CORPORATION | : | |

Appeal from the Order Entered September 11, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 160801387

BEFORE:   PANELLA, P.J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED APRIL 12, 2022**

BBB Industries, LLC ("BBB") appeals from the September 11, 2019 order of the trial court granting summary judgment in favor of Cardone Industries, Inc. ("Cardone") and dismissing BBB's complaint asserting claims against Cardone under the Pennsylvania Uniform Trade Secrets Act ("PUTSA").[1]  BBB also challenges trial court rulings precluding two of its proposed expert witnesses and prohibiting BBB from raising certain theories of misappropriation of trade secrets at trial.  After careful review, we affirm the grant of summary judgment in favor of Cardone and therefore we do not reach BBB's remaining appellate issues.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 12 Pa.C.S. §§ 5301-5308.

The parties to this appeal are competitors in the automotive parts industry. The underlying action arises out of Cardone's alleged misappropriation of BBB's trade secrets related to BBB's contract with the National Automotive Parts Association ("NAPA") to supply NAPA with power-steering products in two of its nine national divisions. NAPA is a nationwide network of automotive part distribution centers and retail stores and is owned and operated by its parent company, Genuine Parts Company ("GPC"). Complaint ¶15; Answer ¶15. GPC owns the distribution centers and certain of the NAPA retail stores, but other retail locations are owned by third-party independent resellers. Complaint ¶15; Answer ¶15.

Historically, BBB supplied only remanufactured rotating electrical parts, such as starters and alternators, to NAPA, but BBB entered the power-steering market in 2010 after acquiring another remanufacturer. Complaint ¶¶13, 19; Answer ¶19. At that time, Cardone was among the largest remanufacturers of aftermarket auto parts and the exclusive supplier for several NAPA divisions; however, the quality of Cardone's power-steering products had come under criticism following the transfer of operations from Philadelphia, where Cardone is headquartered, to Mexico. Complaint ¶¶8, 14, 18; Answer ¶¶8, 14, 18. In 2011, BBB bid on and was awarded the contract to become the sole power-steering parts supplier in NAPA's Mountain Division, a contract which had previously been held by Cardone. Complaint ¶¶6, 23; Answer ¶¶6, 23. In 2012, BBB replaced Cardone as the power-steering supplier for NAPA's Western Division. Complaint ¶¶6, 23; Answer ¶¶6, 23.

BBB alleges in its complaint that its power-steering products enjoyed an excellent reputation with NAPA and NAPA's customers, and in late 2012, BBB entered into negotiations with NAPA to take over as supplier in three additional divisions. Complaint ¶¶6, 23, 29. BBB asserts that the negotiations should have wrapped up quickly as NAPA was already in possession of BBB's pricing and other information, which BBB had uploaded to NAPA's secure website for suppliers, NAPA Sales Team ("NST"). *Id.* ¶¶2, 17, 29. Among the proprietary information that BBB uploaded to NST included invoice and downstream pricing for retail customers and independent resellers; "back-end" rebates for off invoice line items or for reaching certain sales milestones; direct shipping discounts for resellers; and changeover incentives and terms. *Id.* ¶21. BBB understood its information on the NST site to be secure based upon NAPA's "vendor code of conduct" requiring suppliers to respect each other's intellectual property rights, NAPA's internal policy prohibiting its employees from sharing a supplier's information with another supplier, and the representations of the third-party administrator of the site. *Id.* ¶¶16, 17.

While BBB anticipated that the negotiations to take over additional NAPA divisions would proceed smoothly, it did not turn out as BBB expected; instead, according to the complaint, Cardone "began a deliberate, aggressive campaign to undermine BBB and NAPA's burgeoning commercial relationship" using illegally obtained BBB trade secret information. *Id.* ¶6. BBB alleges that the misappropriation of its trade secrets began as late as October 2012 when a Cardone employee obtained downstream pricing for over 2,600 BBB

power-steering parts; the Cardone employee shared this information by email with his co-workers, stating that the BBB pricing information "isn't ours." *Id.* ¶25. According to BBB, Cardone used the stolen pricing data to submit a competing bid for the three NAPA divisions in December 2012 with significantly lower prices and improved terms and incentives as compared to Cardone's existing deal with NAPA. *Id.* ¶30.

BBB alleges that, while it eventually secured the power-steering business in the three new NAPA divisions, its eventual take-over on July 1, 2013 had been delayed for months as a result of the misappropriation and was on significantly less favorable terms than its existing deal with NAPA. *Id.* ¶¶6, 31. As part of the new deal, BBB was required to drop its prices for all power-steering parts it supplied to NAPA, both in its three new divisions and in the two existing divisions it serviced, and also to decrease its prices for all its business with NAPA. *Id.*

On August 11, 2016, BBB filed this instant action against Cardone asserting one claim under the PUTSA. In addition to the October 2012 unauthorized access of confidential information described above, BBB identified several additional alleged misappropriations of trade secrets in its complaint, including June 2013, December 2013, and March 2014 "raid[s]" by a Cardone employee of the secure BBB area of the NST website. *Id.* ¶¶32-

37.[2]   BBB alleges that Cardone misappropriated material it knew or should have known was confidential and protected by non-disclosure agreements "by improperly accessing the NST website" or "by inducing NAPA personnel to disclose BBB's secrets" despite knowing the information was confidential. *Id.* ¶¶43-46.   BBB asserts that it sustained damages based on the delay in the expansion of its business with NAPA, price decreases on power-steering products and other products sold to NAPA, as well as an extension of payment terms to NAPA.  *Id.* ¶48.   Finally, BBB alleges that Cardone received profits above and beyond what it otherwise would have received from NAPA as a result of the misappropriation.  *Id.*

Following discovery, Cardone filed an initial motion for summary judgment, which the trial court denied on September 24, 2018.  On March 6 and 7, 2019, the trial court heard oral argument on various motions *in limine* filed by the parties.  Three of those rulings are at issue here.  First, the trial court granted Cardone's oral motion to preclude the expert testimony of Joseph W. Lesovitz, BBB's expert in business valuation and financial forensics, finding that Lesovitz's testimony would not have allowed the jury "to engage

---

[2] BBB maintains that, after discovery, it has identified as many as ten instances of Cardone's misappropriations of its trade secrets.  BBB first learned of Cardone's alleged theft of its trade secrets in 2014 during discovery in connection with a lawsuit that Cardone brought in Tarrant County, Texas against BBB and Joel Farina, an ex-Cardone employee who allegedly stole numerous confidential documents from Cardone prior to joining BBB. Complaint ¶3; Answer ¶3.  According to the parties, this lawsuit remains pending.

in anything other than speculation to determine the type of damages that were requested or demanded by BBB[.]" N.T., 3/7/19, at 35. Second, the trial court granted Cardone's motion *in limine* to preclude the expert testimony of Larry R. Samuelson, a former NAPA senior executive, as the court found that Samuelson's testimony would not be based on "personal knowledge" and would improperly touch on legal conclusions that were ultimately up to the jury. N.T., 3/6/19, at 149-53; Docket #136, Order, 3/11/19. Finally, the trial court granted Cardone's motion to prevent BBB from relying at trial on other theories of trade secret misappropriation aside from the "improper means" theory alleged in the complaint. Docket #135, Order, 3/11/19; **see** 12 Pa.C.S. § 5302.

On May 1, 2019, after the resolution of the motions *in limine*, Cardone filed a second summary judgment motion limited to the issue of damages causation. On September 11, 2019, the trial court granted that motion. Docket #212, Order, 9/11/19. In its later opinion explaining the rationale for its summary judgment ruling, the trial court emphasized the fact that BBB did not seek any discovery from NAPA, which was weighing numerous other factors in deciding whether to award business to BBB including issues related to quality control, supply chain reliability, and its own profit incentives. Trial Court Opinion, 8/31/20, at 1-2, 8, 10. The court concluded that BBB could not rely only on its valuation expert, Lesovitz, to prove damages, as his report was based upon "countless assumptions" regarding how the alleged misappropriation would have affected NAPA's negotiation position and would

have to have been resolved through numerous jury interrogatories. *Id.* at 7-10.

In light of the insufficient damages evidence, the trial court determined that the jury would only be able to "speculate on what factors motivated NAPA's negotiations without BBB" and would not be able to "isolate how much [of] BBB's loss, if any, was caused by Cardone's alleged misappropriation of pricing trade secrets." *Id.* at 11. Because BBB relied by its own choosing on "conjecture" rather than evidence of NAPA's business decisions that would have "provide[d] reasonable certainty to measuring damages," the court found that summary judgment should be granted in favor of Cardone. *Id.* at 13. BBB filed a timely notice of appeal from the trial court's September 11, 2019 order.[3]

BBB raises the following issues for our review:

> 1. BBB offered extensive evidence that Cardone, its competitor, improperly accessed BBB's trade secrets and used that information to derail BBB's negotiations to serve as a supplier of power-steering products to [NAPA]. Ignoring that evidence, the trial court granted summary judgment in favor of Cardone on BBB's trade secret misappropriation claim on the ground that BBB could only prove its case by offering direct testimony from a third party customer, NAPA. Did the trial court err as a matter of law in granting summary judgment to Cardone on that basis?
>
> 2. The trial court excluded the testimony of BBB's damages expert, Joseph W. Lesovitz, on the ground that, in the absence of direct testimony from NAPA, BBB's claim for damages was purely

_____

[3] The trial court did not request that BBB file a concise statement of errors complained of on appeal. The court filed a Pa.R.A.P. 1925(a) opinion on August 31, 2020.

speculative. Was this holding legally erroneous and an abuse of the trial court's discretion?

3. The trial court excluded portions of the testimony of BBB's automotive-parts industry expert, Larry R. Samuelson, who sought to offer his opinion on the competitive value of the information taken by Cardone as well as the meaning of specialized terms appearing in Cardone's emails, on the ground that BBB could not prove its case without direct testimony from NAPA and that Samuelson lacked direct personal knowledge of the facts at issue. Was this holding legally erroneous and an abuse of the trial court's discretion?

4. The trial court held that BBB could only present evidence at trial supporting an "improper means" theory of misappropriation, even though BBB's complaint also contained allegations supporting a "duty" and "accident or mistake" theory of misappropriation under 12 Pa. Cons. Stat. §§ 5302(2)(ii)(C) & 5302(3)(iii). Did the trial court err as a matter of law in so holding?

BBB Brief at 5-6 (suggested answers omitted).

BBB first argues that the trial court erred in granting summary judgment on the issue of damages because it offered extensive, uncontradicted evidence that Cardone used BBB's trade secrets in a way that materially harmed BBB's power-steering business. This evidence included internal Cardone discussions evidencing that it used BBB's confidential information to its advantage as well as contemporaneous communication from NAPA before and after Cardone submitted its counterbid incorporating the trade secrets, which demonstrated the effect of the counterbid on BBB's business relationship with NAPA. BBB asserts that the timeline of events established in the summary judgment record makes clear that its negotiations with NAPA halted immediately after Cardone's counterbid and that NAPA's demands to BBB that it offer better pricing and terms only happened after the counterbid.

BBB cites to several purported errors of law by the trial court in its decision to grant summary judgment in favor of Cardone. First, BBB contends that the trial court erred in speculating as to other motivations for NAPA's demands on BBB during contract negotiations, when the court was required to view all evidence in the light most favorable to BBB. In addition, BBB asserts that the trial court improperly faulted BBB for not offering direct evidence from NAPA to substantiate damages when it is well-established that circumstantial evidence is sufficient to raise a general issue of material fact, including on the issue of damages. Finally, BBB avers that the trial court incorrectly held that challenges in calculating damages in this matter rendered them speculative as a matter of law, as the question of whether damages are speculative is concerned with whether damages can be proven at all, not with difficulties in calculating the amount.

"[S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *In re Risperdal Litigation*, 223 A.3d 633, 639 (Pa. 2019) (citation omitted). Under our Rules of Civil Procedure, "a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the jury." *Cigna Corp. v. Executive Risk Indemnity, Inc.*, 111 A.3d 204, 210-11 (Pa. Super. 2015) (citation omitted); *see also* Pa.R.Civ.P. 1035.2.

In addressing a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. **Salsberg v. Mann**, 262 A.3d 1267, 1269 (Pa. Super. 2021) (*en banc*). Thus, the trial court may only grant summary judgment "where the right to such judgment is clear and free from all doubt." **Risperdal Litigation**, 223 A.3d at 639 (citation omitted).

The issue of whether the record supports the grant of summary judgment is a question of law as to which our standard of review is *de novo,* and our scope of review is plenary. **Id.**; **Salsberg**, 262 A.3d at 1269. Accordingly, we need not defer to the determinations made by the trial court. **Summers v. Certainteed Corp.**, 997 A.2d 1152, 1159 (Pa. 2010) (citation omitted). "If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied." **Salsberg**, 262 A.3d at 1269 (citation omitted).

Under the PUTSA, a plaintiff can recover damages "both [for] the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." 12 Pa.C.S. § 5304(a). Where damages are not recoverable based upon the actual loss or unjust enrichment methods, a court may also award damages calculated from "a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." **Id.** "[O]ne cannot be held liable for

damages for misappropriation of a trade secret without proof of actual harm through past use or disclosure[.]" ***Den-Tal-Ez, Inc. v. Siemens Capital Corp.***, 566 A.2d 1214, 1232 (Pa. Super. 1989) (*en banc*).

"Generally, under Pennsylvania law, damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences." ***Bailets v. Pennsylvania Turnpike Commission***, 181 A.3d 324, 336 (Pa. 2018). "It is only required that the proof afford a reasonable basis from which the fact-finder can calculate the plaintiff's loss." ***Witherspoon v. McDowell-Wright***, 241 A.3d 1182, 1188 (Pa. Super. 2020) (quoting ***Delahanty v. First Pennsylvania Bank, N.A.***, 464 A.2d 1243, 1258 (Pa. Super. 1983)). Although the evidence does not require mathematical precision, a plaintiff must put present "sufficient facts" such that the fact-finder "can arrive at an intelligent estimate [of damages] without conjecture." ***Id.*** (quoting ***Delahanty***, 464 A.2d at 1257-58). "[T]he test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages[; t]hus, damages are speculative only if the uncertainty concerns the fact of damages rather than the amount." ***Logan v. Mirror Printing Co. of Altoona, Pa.***, 600 A.2d 225, 227 (Pa. Super. 1991) (citation and emphasis omitted).

Upon review, we ascertain no error in the trial court's grant of summary judgment in favor of Cardone.[4]  Initially, we note that the summary judgment record in this matter is replete with evidence that, as part of its negotiation practice, NAPA shared BBB's and Cardone's business information between and among each other during the 2010 to 2013 time period when the parties were competing for NAPA's power-steering parts business.  BBB employees admitted during depositions that NAPA provided information to BBB relating to Cardone's independent reseller discounts, back-end rebates, and distribution center pricing during the relevant time period.  **See** Cardone Motion for Summary Judgment, 3/12/18, Exhibit A at 54-55, Exhibit B at 234-37, Exhibit L at 155-57, 176.  Moreover, one of the principal avenues through

---

[4] Preliminarily, we note that our ability to thoroughly set forth the underlying facts in this case has been substantially impeded by the parties' filing of large portions of the summary judgment record under seal in the trial court pursuant to a jointly agreed upon protective order.  **See** Docket #14, Agreed Protective Order Regarding the Disclosure and Use of Discovery Materials, 10/5/16, at 1 (limiting disclosure of all "confidential, proprietary, trade secret, and/or commercially sensitive information").  In this Court, the parties filed heavily redacted briefs and designated much of their reproduced record as under seal, including the entire portions of deposition transcripts of BBB and Cardone employees to the extent relied upon at summary judgment and email chains the confidentiality of which appears to be based solely upon mere references to the status of negotiations with NAPA.  While we recognize that protective orders are expressly permitted during the discovery phase of litigation "to protect a party . . . from unreasonable annoyance, embarrassment, oppression, burden or expense," **see** Pa.R.Civ.P. 4012, we caution the parties from their overzealous use of the protective order with respect to these summary judgment proceedings.  **See A.A. v. Glicken**, 237 A.3d 1165, 1170 (Pa. Super. 2020) (noting that there exists a common law presumption of openness of judicial proceedings and that the judicial record should only be closed to the public on good cause shown).

which BBB alleges that Cardone misappropriated its trade secrets was by way of a "mysterious email" sent by a NAPA employee to a Cardone employee in August 2012. BBB Brief at 14; BBB Opposition to Motion for Summary Judgment, 5/31/19, Exhibit 37. While this does not alter the fact that we must assume for our present analysis that Cardone improperly obtained BBB's trade secrets, the evidence of NAPA's frequent information sharing among business competitors necessarily informs our analysis of the primary issue in this appeal of whether BBB has produced evidence sufficient to show that it suffered damages from Cardone's alleged misappropriations.

BBB's alleged damages in this case fall into three categories. First, BBB asserts that its takeover of additional NAPA divisions for which negotiations appeared to be winding down at the end of 2012 was delayed for several months until July 2013 as a result of Cardone's December 2012 bid incorporating BBB's trade secrets. Second, BBB contends that it was required to offer more favorable terms and pricing to NAPA after Cardone tendered its bid. And third, BBB maintains that Cardone's use of the confidential information prevented BBB from becoming the nationwide power-steering parts supplier for NAPA and limited it to only taking over three of the remaining seven regional divisions.

As the trial court explained in its opinion, however, BBB's decision to not seek any discovery from NAPA[5] is fatal to BBB's attempt to show, with any degree of reasonable certainty, that BBB sustained these claimed damages. In the absence of firsthand testimony from NAPA employees or internal NAPA communications, BBB relies in large part on NAPA's communications to BBB and Cardone, which BBB argues show that it was the superior supplier in NAPA's eyes and poised to take over all of NAPA's power-steering business when negotiations began in 2012. For example, NAPA told Cardone as early as 2010 that its power-steering parts had engendered numerous customer complaints regarding the quality of the parts. BBB Opposition to Motion for Attorney's Fees, 10/10/19, Exhibit 1 at 342; BBB Opposition to Motion for Summary Judgment, 5/31/19, Exhibit 21. In addition, BBB cites to NAPA's warnings to Cardone in late 2012 that it was at risk of losing NAPA's power-steering business. BBB Opposition to Motion for Summary Judgment, 5/31/19, Exhibits 40, 41.

However, the summary judgment record calls into question whether NAPA's communications to BBB and Cardone accurately revealed NAPA's bargaining position and its true view of its competing parts suppliers. While NAPA asked BBB to make certain concessions to match Cardone on payment

---

[5] BBB stated below that it made the intentional business decision to not "disturb an important client [i.e. NAPA] by unnecessarily dragging them into discovery." BBB Opposition to Motion In Limine to Preclude Samuelson Testimony, 5/3/18, ¶5; *see also* N.T., 3/6/19, at 36-38.

- 14 -

terms and incentives, the record is devoid of evidence to show that these requests were based upon an actual Cardone counter proposal rather than being simply a negotiation tactic. Cardone Motion for Summary Judgment, 3/12/18, Exhibit C at 230, 238-39, Exhibit L at 130-31; BBB Opposition to Motion for Summary Judgment, 5/31/19, Exhibit 63. In addition, as NAPA's description of quality issues at its competitor shifted over the course of negotiations, BBB employees began to question internally whether NAPA was being entirely truthful during the negotiations. BBB Opposition to Motion for Summary Judgment, 5/31/19, Exhibit 60.

By virtue of the fact that BBB chose not to take evidence directly from NAPA, whether in the form of interrogatories, discovery of internal communications, or through depositions, a jury would only be left to guess as to the key issue in this case relating to the factors NAPA considered—and the relative weight afforded to each of these factors—when awarding its power-steering parts business. BBB introduced into the record at least circumstantial evidence that NAPA was evaluating its power-steering parts suppliers on factors entirely separate from pricing and the other negotiated terms of the supplier agreements. BBB Opposition to Motion for Summary Judgment, 5/31/19, Exhibit 32. However, as the trial court explained, "the record is silent on whether these factors are assumed to be equal" or, assuming they are weighted differently, "which [factors are] more important to NAPA." Docket #212, Order, 9/11/19, at 2. In the absence of firsthand evidence from

NAPA, its decision-making process remains entirely obscured from view. *See id.* at 3 ("Without hearing from NAPA, it's all guesswork.").

Moreover, by relying on the out-of-court statements of NAPA employees to prove that the company looked more favorably on one of its suppliers over another, BBB is offering the NAPA statements for the truth of the matter asserted and thus runs squarely into the rule against hearsay. *See* Pa.R.E. 801(c), 802. In Pennsylvania, a trial court may consider hearsay presented by a non-movant in opposition to a summary judgment motion but only if the party relying on the hearsay can demonstrate to the trial court "a plausible avenue for the admission at trial of the hearsay." *Kardos v. Armstrong Pumps, Inc.*, 222 A.3d 393, 402 (Pa. Super. 2019); *see also Petrina v. Allied Glove Corp.*, 46 A.3d 795, 799 (Pa. Super. 2012).

BBB argues that NAPA's out-of-court statements "fall squarely within the hearsay exception for '[a] statement of the declarant's then-existing state of mind[.]'"[6] BBB Reply Brief at 9 (quoting Pa.R.E. 803(3)). As our Supreme Court has recently explained, "a singular expression of the declarant's state

---

[6] BBB also asserts that this Court should not undertake an inquiry into the potential admissibility of the NAPA evidence because the trial court did not definitively rule that the communications at issue are hearsay. BBB Reply Brief at 9. While the trial court did not expressly rule that the NAPA statements are inadmissible hearsay, the question of whether such communications were covered by exceptions to the hearsay rule was debated at hearings on the motions *in limine*. *See* N.T., 3/6/19, at 174-75. In any event, this Court is not bound by the rationale of the trial court, and we may affirm its ruling on any basis. *Commonwealth v. Goodmond*, 190 A.3d 1197, 1202 n.4 (Pa. Super. 2018).

of mind" is generally admissible under our Rules of Evidence but where a statement "contains both a state of mind component and a 'fact-bound' component," the statement is inadmissible unless the "fact-bound" assertion falls within a separate hearsay exception. **Commonwealth v. Fitzpatrick**, 255 A.3d 452, 479-80 (Pa. 2021) (citation omitted). The NAPA statements here are exactly this type of "compound statements" mixing NAPA's state of mind concerning the performance of its suppliers and a "fact-bound" component involving the actual quality of the products that the suppliers were providing to NAPA. **Id.** at 473, 480 (citation omitted). Therefore, these statements would be inadmissible at trial unless a separate hearsay exception is put forth for the fact-based component that would offer "a plausible avenue for the admission at trial of the hearsay." **Id.** at 479-80; **Kardos**, 222 A.3d at 402. No such alternate exception to the hearsay rule has been asserted.

In opposing Cardone's summary judgment motion, BBB also relies on the views of its own employees and Cardone employees concerning negotiations with NAPA as well as the "timeline of events" before and after Cardone submitted its competing bid in December 2012. BBB Brief at 33. Thus, BBB employees believed that NAPA was negotiating aggressively and that the deal was essentially wrapped up by late 2012, while Cardone executives recognized during the same time period that there was a strong possibility that it would lose additional NAPA divisions. BBB Opposition to Motion for Summary Judgment, 5/31/19, Exhibit 17 at 229, 234, Exhibits 33, 55. From BBB's perspective, the deal that seemed all but done stalled after

Cardone submitted its competing bid in December 2012, resulting in BBB having to submit its own revised proposal on less favorable terms in early 2013. *Id.*, Exhibit 17 at 229-30, 234, Exhibits 63-65.

While this evidence sheds some light on the negotiations, BBB's and Cardone's internal, subjective views on their business dealings with NAPA fail to show within a reasonable degree of certainty how Cardone caused NAPA to take specific action that damaged BBB. For example, while BBB asserts that it sustained damages based upon a delay of several months before its takeover of additional NAPA divisions was completed in July 2013, BBB points to no evidence that the transition was set to occur earlier and instead relies only on its employees' **belief** that a deal was almost complete before Cardone's counter-bid and BBB's **expectation** that the transition would have occurred earlier. *Id.*, Exhibit 17 at 234, 422. Similarly, the claim of damages arising out of BBB only obtaining three new NAPA divisions instead of all the remaining seven is based upon the fact that BBB was having discussions with NAPA about taking over all the remaining divisions, rather than any concrete plan for NAPA to transfer the full slate of its divisions to BBB. *Id.*, Exhibit 17 at 299, Exhibit 59. Without evidence from NAPA itself, we are left only with BBB and Cardone looking from the outside in on NAPA's decision-making process. Based upon the summary judgment record, the jury would therefore be left to speculate not just on the amount of damages but whether Cardone caused the claimed damages at all. *Logan*, 600 A.2d at 227.

Finally, we observe that the testimony of BBB's expert witnesses would not have filled in the holes in BBB's case with respect to damages causation. The testimony of BBB's financial valuation expert, Lesovitz, would have served to assist in calculating damages based upon the various harms BBB allegedly suffered arising out of Cardone's trade secret misappropriations. *See* Cardone Motion in Limine to Preclude Portions of Expert Report and Opinions of Lesovitz, 3/19/18, Exhibit A (Lesovitz Expert Report) at 1-3. However, as BBB acknowledges in its brief, Lesovitz would have "merely quantified and added up the damages" in his testimony and he would not independently "show evidence of damages causation." BBB Brief at 34; *see also id.* at 50; BBB Reply Brief at 18 n.2. Similarly, BBB's industry expert, Samuelson, would have drawn on his work experience at NAPA and other automotive aftermarket companies to identify the types of information that would be classified as trade secrets within the industry and Cardone's business performance during the relevant time period. *See* Cardone Motion in Limine to Preclude Portions of Expert Report and Opinions of Samuelson, 3/16/18, Exhibit A (Samuelson Expert Report) at 1. Nevertheless, as BBB recognizes on appeal, the testimony of Samuelson, who lacked any firsthand knowledge of NAPA's deliberations in 2012 and 2013, does not create a genuine issue of material fact with respect to the issue of whether BBB actually sustained any damages from Cardone's actions. *See* BBB Brief at 50.

Accordingly, based upon the absence in the record sufficient facts that would have allowed a jury to arrive at an intelligent estimate of damages

without conjecture, we find no error in the trial court's grant of summary judgment in favor of Cardone on the issue of damages causation. **Witherspoon**, 241 A.3d at 1188; **Logan**, 600 A.2d at 227. As we have concluded that the trial court did not err in awarding summary judgment in favor of Cardone, we need not address BBB's remaining three appellate issues concerning the trial court's exclusion of its two experts, Lesovitz and Samuelson, and the court's decision that BBB could only present evidence of misappropriation under an "improper means" theory. We therefore affirm the trial court's September 11, 2019 order.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/12/2022